323.0253 Wells Fargo Bank, N.A. by Claire Myers v. Samuel Sweet, Appellant by Adam Goodman Are both sides ready to proceed? Mr. Goodman, you may proceed. My name is Adam Goodman, and my client's name is Samuel Sweet. Mr. Sweet's an attorney in Michigan. He's also a part-time Article I federal official. He's what's called a panel trustee. It's part of the United States Trustees Program, which is part of the United States Department of Justice. And what he's tasked with doing is handling the bankruptcies, in the first instance, of people who live in a certain defined area within the United States District Court for the Eastern District of Michigan, where Mr. Sweet lives and where the Wins lived at the time of the underlying case was filed. And what Mr. Sweet is seeking to do here is administer an asset of the Wins bankruptcy, and that asset is a townhouse in DuPage County. Well, there's no way to ever get the townhouse back, right? That's correct, Your Honor. So what is the asset he's administering? It's not the townhouse. Or that he seeks to administer. Right. And this was the argument I made partially successfully and partially unsuccessfully before, Your Honor, and two of your colleagues several years ago, and you declined to reach it and disagreed with me in part. Because of statute of repose, statute of limitations issues, it is now too late to retrieve or claw back or get the home back from the current owners. But there's still, if the 1401 petition is successful, it would revert to as if the defendants had just been served and it was now time for them to appear and answer. And what Mr. Sweet could do as a successor and interest to the Wins is he could answer and he could counterclaim against Wells Fargo. And his counterclaim against Wells Fargo would sound in negligence. It would be that Wells Fargo had deprived the Wins, and by extension Mr. Sweet as a trustee of the Wins bankruptcy estate, of the opportunity to administer this asset. So, had there been equity in the townhome, perhaps the equity could have been redeemed by the Wins. Or perhaps the townhome could have been sold. That seems more likely. Why the argument for there being equity when in fact after the judicial sale it was a $50,000 deficiency? Well, that's one set of facts. I mean, judicial sales usually don't reach an optimum price. People, judicial sales, while there are professional bidders and while ads have to be run in the paper and on the internet and so forth, judicial sales usually don't do as well as real estate brokers do. Judicial sales don't usually do as well as arms-length negotiations, say, between a bankruptcy trustee and potential buyers. And it may be that our claim will founder. It may be that the claim will be unsuccessful, that we won't be able to meet our burden of proof, or that we'll lose. But the claim is – think of it as analogous in some ways to last clear chance. The claim is that the Wins and Mr. Sweet and the Wins estate, for which Mr. Sweet has charge, were deprived of the opportunity to administer the estate. And I think it's quite clear under the U.S. Supreme Court doctrine first set forth in Mullane v. Central Hanover Bank and Trust in 1950 and is repeatedly followed in both the state courts as well as the federal courts that serving someone by publication is highly disfavored. It usually doesn't work. Most people don't realize they've been served by publication and they get defaulted. Here, Wells Fargo, we assert, and this court recognized in the first appeal in this case, I think, Wells Fargo had this address in Grand Blanc, Michigan. And they had a tremendous amount of evidence that it was a good address, including the process server having interviewed the apartment manager of the complex who confirmed that it was a good address and that they lived there. There was also information from the Michigan Department of Motor Vehicles, the Michigan equivalent of the Illinois Secretary of State, information from the post office. But, counsel, that's really not the issue here. The issue here is whether or not latches should apply because the foreclosure happened in 2010. The bankruptcy occurred in 2010. The mortgage, the Wins obviously knew about the mortgage foreclosure because they listed the deficiency judgment on their schedule and they listed the bank as a creditor in their bankruptcy petition. So before we can even get to the issue of whether or not there is a viable 214.01, based on the underlying judgment being void, we have to address the issue of latches, don't we? Sure. I was following the thread that was laid in front of me. But I would respectfully suggest that the latches, that both Judge Rome and Judge Chapman erred in applying latches here for the reasons set forth in the three cases upon which we placed principal reliance in our appellant brief, which were the same three cases we presented to the trial courts and were the cases that caused Judge Rome to change his mind. He originally found both judicial estoppel and latches applied and then he changed his mind and said that judicial estoppel didn't apply. And the most important of those cases is Toe v. Pagano. And I apologize, it's 312 Southwest 3rd, 751. We inadvertently put second, I guess showing our ages, in our brief. 312 Southwest 3rd, 751 v. Texas State Appellate Court of Opinion. And then we also rely upon a Seventh Circuit case and a federal bankruptcy case from a bankruptcy court in Texas. And the idea is that it is inappropriate to tax Mr. Sweet as 1401 petitioner or as defendant seeking to supplant the wins or as appellant. It is inappropriate to tax him for anything that the wins did or didn't do after the bankruptcy was filed. So, Mr. Goodman, I want to refine Justice Albrecht's question. Sure. And I want to ask you, why doesn't latches apply at the time that the wins filed their bankruptcy petition? Why didn't latches apply at that point? Because if it does, then everything you're citing is irrelevant because we're not taxing Mr. Sweet with latches for anything after the fact. I want to look at this period of time where the wins knew they were supposed to pay their mortgage, knew they stopped paying their mortgage in January of 2009. When they got the mortgage in 2004, they were told if you don't pay your mortgage, you're going to be foreclosed on. Okay, they weren't served except by publication. Let's accept that maybe it wasn't ideal service. But when they filed that petition, when they filed that F schedule, they clearly knew about the foreclosure because they included the $50,000 deficiency. At that point in time, why couldn't you say latches apply? They didn't do what they should have done to prevent this being sold to a good faith purchaser, and latches should apply. So I'd like you to focus on why that wouldn't be a basis to dismiss the case. Fair enough. That is a default judgment. The service of process took a little longer than usual because there had to be service by publication, but it's a default judgment. This all took place in 2009 and 2010 in a very confined period of time. And were the court to find that despite the fact that that was a relatively confined period of time, like roughly a year, were the court to find that that would be sufficient to warrant application of latches, then that would moot the arguments that we made here, that we made below, that we made when the case was in the second district, in the second appeal, and so forth. That is not what Wells Fargo has, it was my understanding, was urging on the courts all along. And that is not something that is normally supported by the case law. Well, the case law has changed since Casimir's, so we're in a relatively new space. Fair enough. But Casimir's is applying the 1401 statute and the modifications having to do with service of process and changing the statute, reducing the length of the statute as opposed to two years under certain circumstances. And this all comes up within the context of 1401 petitions. And I don't think it's any accident that the statute of repose was for things like complaining that the summons didn't have the right address or the right seal or things like that, but where there was hand service. I don't think there's any question that it's not a coincidence that there was a two-year statute of repose that matches the two-year deadline to bring a 1401 petition. I don't think anyone has ever suggested, until now, that you could not, that latches would have barred. In other words, had the Wins filled out the bankruptcy petition properly in 2010, and had they disclosed the existence of the foreclosure lawsuit, and had they known of or disclosed the fact that they hadn't been hand served, I don't think there's any question that Mr. Sweet could have come into the DuPage trial court in 2010, or could have maybe potentially removed the case from the DuPage trial court to the United States District Court for the Northern District of Illinois, and then had it shipped to the Eastern District of Michigan. I don't know how the venue would have worked for that. But frequently, when it involves local property, the cases get moved to the bankruptcy court and become adversary proceedings. I don't think there's any question that that would not have been barred by latches, that the two-year statute of repose would not have protected the then owner. And I would respectfully suggest that that's correct, that that is based upon a determination by the legislature that, at minimum, you have two years regardless of the basis for the unsettling, undoing the apple cart, or trying to undo what has already happened. The normal default rule is two years. Now, here you arguably have an unlimited amount of time with regard to seeking it, because there is arguably an absence of personal jurisdiction. But we freely concede, as I said a few minutes ago, that there are time limitations on the remedies available. And that is why we respectfully suggested in the last appeal that it wasn't necessary to name the current occupants slash owners of the property, because there is no way we could adversely affect their rights. The then panel of this court disagreed with us. The case was remanded. We added the then owners of the property. They hired an attorney, and the attorney has been twiddling his thumbs for the last several years because he recognizes, rightly or wrongly, that there is nothing that he needs to do, that Wells Fargo is vindicating his interests, and that there is no way we can take the home away from the plaintiff. So if you step back and look at the laches argument that Wells Fargo made, I thought, in its briefs, both here and below, the argument is that they expended resources defending the case and that the house was sold to somebody, and then it was sold to somebody else, and then it was sold to somebody else, and that it would be burdensome to obligate them at this late date to defend themselves, even if their service of process was defective. And that argument is wrong because Mr. Sweet cannot be tagged, he cannot be blamed for anything the Wins did or didn't do after the moment that they filed the bankruptcy petition and he was appointed. Counsel, let me ask about that, because in the schedules filed by the debtor in the bankruptcy, there is clear reference to a deficiency judgment and Wells Fargo. So can Mr. Sweet be tagged with at least inquiry notice that there's some piece of property out there that he may be looking for? Conceivably, but, first of all, that argument wasn't made below, I don't think. Second, and more importantly, Michigan is not in the main judicial foreclosure state. And so the description of what happened, the fact that there is an extant deficiency judgment, does not in any way place any reasonable bankruptcy trustee in Michigan on notice that there is a colorable claim that someone in Illinois wasn't properly served with a foreclosure lawsuit. People in Michigan, I see my time is up, may I finish the answer? You may. People in Michigan wouldn't be familiar, as a matter of course, with judicial foreclosure states or judicial foreclosure proceedings. And the description of the deficiency judgment as a liability does not in any way serve to place anyone on notice that there's a possibility of an asset associated with defective service. And that was the omission from the schedules in 2010 that was not cured until 2018 or 2019 when Mr. Sweet was reappointed. Thank you. Justice Hedl, any additional questions? Yes. Counsel, before that question was asked, you were about ready to say that Mr. Sweet cannot be taxed with the time previously accounted for by the original homeowner. There's no case law to support that, though, correct? I would respectfully disagree. I would say that there's no Illinois published case law that says that. But I think Toe v. Pagano pretty clearly said the Texas intermediate appellate decision pretty clearly says that. And Toe v. Pagano cites a bunch of other cases. And there are other cases that stand for that principle that could have been cited or discussed by the parties. This is grounded in the language of the relevant section of the bankruptcy code, which is discussed by both parties in its briefs. And I alluded earlier to the analogy of their paths diverge. So at the point that someone files for bankruptcy, the trustee continues on behalf of the estate. The debtors, assuming they're people, continue to live their lives. But nothing the debtors do or don't do after the line has diverged can be attributed to or can be – the trustee can't be blamed for any of that. He steps into the shoes, to use the tired metaphor that's sometimes found in the case law, but only for things that happened before the divergence. Thank you. Well, just – I have one other question. I apologize. No, no, no. On May 5th, 2010, the Tinsons, who had no interest in the foreclosure action or they weren't parties, they become good-faith purchasers, right? As far as I know, I mean they bought a – They bought it. They're good-faith purchasers. So as of May 5th, 2010, there is – and that's the day before the debtors filed their bankruptcy petition. So at that point, there is no property available. Even if they filed a 214-01 petition, there's a good-faith purchaser that has come into play. Well, I don't know that that's the case. I think there comes a point – I think it's probably two years after the sale is confirmed or two years after they take title, depending on whether they were the bidders at the foreclosure sale or the bank was the bidder at the foreclosure sale, and then they bought it from the bank. They bought it from the bank. Right, right. So there comes a point two years after that where their title is incontestable. But that doesn't change the fact that there was a lawsuit filed by Wells Fargo against the winds and that Mr. Sweet, had he been apprised fully of this in 2010, could have sought to undo that within the two-year time period. And he was deprived of that opportunity, and therefore, by extension, the winds' unsecured creditors were deprived of that opportunity. This is really a fight between the unsecured creditors represented by Mr. Sweet and the secured creditor, Wells Fargo, about whether Wells Fargo damaged the unsecured creditors in any way. Well, Wells Fargo is an unsecured creditor, right? Well, with regard to the deficiency judgment. Which is, as I calculate, about 65% or 70% of all the unsecured debt. So you're suing Wells Fargo to recover money for Wells Fargo in a certain level. Well, that may be true. That type of decision is a decision that Mr. Sweet has the discretion to make. It is not, in a Chapter 7 liquidation, he's not obligated to survey the unsecured creditors and ask them what they want. And it's extraordinarily unlikely to happen in a bankruptcy of regular people. In theory, in larger bankruptcies, more complicated bankruptcies, a group of unsecured creditors led by Wells Fargo could have voted Mr. Sweet out and voted somebody else in. But no attempt was made to do anything like that. Thank you, Mr. Goodman.  Ms. Myers. Good morning, Your Honors, and may it please the Court, Counsel. My name is Claire Myers, and I represent the Abilene Wells Fargo Bank. Your Honors, as has been pointed out already, this case can be decided on a single issue, Latches. Latches precludes this 2-1401 petition from being brought several years after the foreclosure it challenges. The facts of this case were already decided by the Illinois Supreme Court in Kuzmir's VPNC Bank a few years ago during the pendency of the second appeal in this case. In Kuzmir's, the court held that Latches precluded borrowers from bringing a 2-1401 petition which alleged that they had been improperly served roughly seven years after foreclosure, during which time bona fide purchasers had purchased the property. The facts are materially identical here. Here, the borrowers in this case, Paul and Sandy Nguyen, brought the 2-1401 petition roughly almost eight years, even longer than the borrowers in Kuzmir's, eight years after the foreclosure, alleging that they had been improperly served, and during which time multiple third-party innocent purchasers had purchased the property. Kuzmir's is directly on point and dispositive, and Kuzmir's decides this case. The substitution of the bankruptcy trustee, Mr. Sweet, does not make a difference in this case, as the circuit court correctly found. And Mr. Sweet has offered no on-point authority to suggest otherwise. The cases that Mr. Sweet relied on in this case, specifically Toe, which he mentioned before, Bicek, Sue, all present completely different factual circumstances than the case before us. In each of those cases, the debtors hid assets from the creditors by not listing them in the bankruptcy, then pursued those claims without letting the bankruptcy trustee ever know about them. This case is entirely different. If we look at the procedural history of this case, we'll see that the borrowers requested that the bankruptcy trustee intervene in this case, asked that the bankruptcy trustee, Mr. Sweet, pursue the claims on their behalf, and take over the case from them. And it is worth noting, the claim that the parties are adverse in this litigation is significantly undermined by the fact that they are represented by the same counsel, which ordinarily would not be permitted by Illinois Supreme Court rules if the parties were actually adverse. Your Honor, it's our position that Latches decides this case completely, and the court need not move on to the other bases on which it can affirm. But the court is entitled to affirm on any basis that is supported by the record, and multiple independent grounds exist for affirming the circuit court's decision. So it is our position that judicial estoppel also bars this petition from being brought. The borrowers represented to the bankruptcy court that they had no interest in the property. They did not list it as an asset. They did not list the foreclosure as a liability. Having represented that to the bankruptcy court, and having won on those grounds, having obtained a favorable result by obtaining a discharge in bankruptcy and reaping the benefits of that, they're not entitled to later come before a different court and represent exactly the opposite. But counsel, didn't they list the deficiency judgment in their bankruptcy petition on their schedules? Thank you, Your Honor. The Wins listed an unspecific deficiency balance to Wells Fargo home mortgage, but they did not list that there was a foreclosure. And most importantly, they did not claim an interest in the property. And I assume there's evidence of that question was asked at some point in the bankruptcy proceedings. Have you ever been foreclosed upon? Yes, that is a question in the schedules. It is my understanding that that is, Your Honor. Isn't the language of 541A a little inconsistent with your position that if latches didn't apply at the time the Wins applied for a petition for bankruptcy, suites should not be charged with latches? Respectfully, Your Honor, I would disagree. Why? It is our position that latches applies equally to Mr. Suite in this situation. As Justice Albrecht mentioned, the trustee was aware of the foreclosure, at least on inquiry notice, that the foreclosure existed from 2010. But 30 seconds ago you just said it was a very general description and didn't allege a foreclosure. So which is it? Certainly, Your Honor. I think I can be more precise. I would answer that the borrowers in their bankruptcy schedule disclaimed all interest in the property. They did not list that there was a foreclosure. They did not list the property as an asset. That's completely inconsistent with the mistaken belief that they still owned the property. But that does not mean that the trustee did not have a duty to inquire as to these unspecified debts that were listed, these liabilities, potential assets, anything in the schedule that could help him obtain relief for the creditors. Are you persisting in the mootness claim? Thank you, Your Honor. With respect to our point that there is no remedy available in this case, we would, Your Honor. As has been discussed in my friend's opening argument, there is no relief available to the creditors in this case. And it's very unclear what relief, if any, Mr. Sweet is able to obtain by pursuing these claims on behalf of maybe the trustee, maybe the Wins. Section 214.01 does not provide monetary relief. And the idea that Mr. Sweet could pursue perhaps, I believe, counsel mentioned a negligence claim, in his briefing mentioned an unspecified due process claim. All that is entirely speculative, and it is unclear whether the creditors would be able to obtain any relief at all from pursuing this claim. Is negligence available as a remedy here? Thank you, Your Honor. That question has not been briefed. It was raised for the first time during our argument today. I don't believe it would be in this case, but I'd be happy to provide supplemental briefing on that point if Your Honors would like. Justice Hedl? No questions. Justice Albright? Nothing further. Ms. Myers, anything else? I would like to add that it's also Wells Fargo's position that the claim fails on its merits. We have argued strenuously throughout the course of this many-year litigation that the borrowers were properly served by publication. After assiduous efforts were made to locate them and to serve them, 22 attempts were made, including seven at the address they now claim was the correct address, seven attempts at different times of day, over five separate days. So it is our position that the claim would fail on its merits. However, the court need not reach the merits. As stated in the beginning of my argument, the court can decide this case on latches alone. Kuzmir's controls and is dispositive here, and the substitution of the bankruptcy trustee does nothing to change that. If you agree with those two propositions, that is all the court needs to determine the resolution of this case. And is it indeed the case that there was never an affidavit filed by the Wins suggesting that they did not know about the foreclosure? That is correct, Your Honor, and the Wins have never argued during this litigation that they did not know. Thank you very much, Ms. Myers. Thank you very much. Mr. Goodman, rebuttal. Ms. Myers begins by invoking Kuzmir's. Kuzmir's, as I alluded to in my opening argument, involved a defective summons, a summons that I don't remember exactly what the defect was, but it wasn't sealed properly or didn't list all of the defendants on the face of the summons. Instead, it listed them on a second page or something like that. But Kuzmir's knew, and this was critical, I think, to the Supreme Court's holding, that he had been served. He knew someone had handed him the complaint, even if there was a technical defect in the summons. Here, Mr. Sweet didn't know in 2010 that the Wins had been served by publication while Wells Fargo knew their address. He didn't know necessarily – he wasn't necessarily put on inquiry notice about the existence of a foreclosure lawsuit, what the index number was of the foreclosure lawsuit, where the foreclosure lawsuit was pending. I suppose he could have inferred that there had been a judgment in a foreclosure lawsuit. And Ms. Myers then continues by saying, well, the cases that we're relying on, BSEC and Toe, involve plaintiffs who hid assets, who engaged in – I think most, if not all, of the cases involve personal injury claims of some sort. People who didn't reveal the existence of their personal injury claim. But here, the Wins hid the asset, too, albeit perhaps inadvertently. As the colloquy with Ms. Myers pointed out, they didn't disclose the existence of the lawsuit. They didn't disclose the index number.  What's the asset, counsel? The asset today is the ability to answer and counterclaim. The asset in 2010 may well have been, additionally, the ability to undo the foreclosure, defease the first buyer, and retrieve the home. And that opportunity was not disclosed by the Wins in their foreclosure – description of the foreclosure in the bankruptcy. Which was the very argument that Wells Fargo made to Judge Rome that caused me, that caused the Wins' then-attorneys, to contact Mr. Sweet. That the Wins had offered a grossly inadequate explanation of the potential claim that they were raising in the 1401 petition. And I was forced to agree with them once I was notified of the bankruptcy. They argued our description, Ben Kline's description, the Wins' description, in their bankruptcy petition was grossly inadequate. And then we went to Flint, to Detroit, to the Eastern District of Michigan, reopened the bankruptcy, modified the description to give a full and fulsome description. Where, incidentally, Wells Fargo could have shown up. Wells Fargo knew we were doing this. We asked Judge Rome for an extension of time and attached the paperwork, including the notice of motion, to the motion for extension of time. It's in the record. Wells Fargo could have shown up in Flint and asked the bankruptcy judge in Flint to deny the request to reopen. They could have argued that it was too late. They could have argued that Mr. Sweet was stopped because of things the Wins had or hadn't done. They could have argued – they didn't do any of those things. It's even worse. As we pointed out in our brief, they sat on their latches argument for years. There's a certain irony here. The first appeal to this court was a straight 6-15, where they argued that the petition didn't state a claim. And we said, oh no, no, it does state a claim. And in the first appeal, this court agreed with us that it did or could state a claim. They could have brought up latches then. Instead, they sat on their latches argument for years. It was only after they lost the 6-15 that they brought up latches. Now, Ms. Myers, in the best tradition of tall building lawyering – I used to be a tall building lawyer – Ms. Myers brings up the addresses and she says, well, seven attempts were made and there were 22 attempts altogether, including some other addresses. That ship has sailed. This court's decision in the first appeal resolved that issue in Mr. Sweet's favor, a successor in interest to the Wins. But even if it hadn't, as it was pointed out in the briefs – and let me just finish the sentence – that misses the point because the point is that they shouldn't have given notice by publication. They knew these people lived at the Grand Blanc address. So they should have asked for permission to serve them by posting or certified mail or Federal Express or something like that, and that would have comported with due process. Justice Hedl, any additional questions? No. Thank you, Mr. Goodwin. Thank you. The court thanks both sides for spirited arguments. The matter will be taken under advisement and a decision will be rendered in due course. Thank you very much. Court is adjourned as it relates to the argument. My understanding is that there may – you don't have to – but there may be some questions, and if so, feel free to raise your hand and ask them. As was indicated in the last case, unfortunately, we cannot answer questions about the specific case. Thank you. I'm moving the hallway outside the presence of the court, and perhaps Ms. Myers as well, if anyone wants to stick around. Any additional questions? To us, counsel, I think the – And, Mr. Goodwin, you can't ask any questions. I'm kidding. All right. Any questions? Yes, ma'am. I'm sorry, and it might impinge on this case. What is latches? Oh, that's a good question. Do you want to answer that? The question – Well, we're going to let – It's kind of the key to the case. Yeah. I'm sorry. Oh, no, it's a great question. The question is, what is latches? Slippery slope. And latches is a legal theory whereby if you sit on your rights long enough so that the other side changes a position and does things not knowing that you're going to – you have this claim to make. It's different from the statute of limitations. It's a common law theory, and it's done in equity where if you have maybe an equity claim against somebody and you don't tell them about it, you knowingly let them change their position not knowing that you have this claim to make, then there is a potential defense of latches. That's what latches is. It's a defense where you have a potential claim against somebody, you know, like in trespassing or something like that, and it's used only in the court of equity, not for a breach of contract or a negligence case, and you let them do something like build something or do something and don't say anything, then they can raise the defense of latches. You let me change my position, and you didn't tell me that you have this claim. You didn't object. You didn't file lawsuits, so you're guilty of latches. You sat on your hands too long and didn't say anything, and now the other side's prejudiced because they took actions that they wouldn't have taken if you had filed the suit on time. That's kind of the doctrine. And that's what was ironic about the argument that you noticed Mr. Goodman was chuckling a little bit, latches on latches. So they sat on their hands raising the argument that we sat on our hands, and that was the joke. Mr. Goodman, you remind me of a law professor of mine almost to a T. So hopefully I wasn't looking at you too intently. What grade did you get? I'm not going to disclose on the grounds of being a criminal agent. Any additional questions? Yes, ma'am. Thank you, Josh. This case is described as a case of equity, and I'm curious if all cases of equity are in the same trial format as, you know, cases that may have a refugee that's not in equity, or is there a different process as to how that case is tried or any formalities that may be followed? Okay. The question is whether cases that involve equity have a different procedure than other kinds of cases. I'll let somebody. The major distinction is generally you don't have the right to a jury trial in an equity case. But it's often the case that there are both equity and legal arguments at the same time. So it would be in the same lawsuit. The jurisdiction I came from, we would all be hearing it, the same case. So they're argued simultaneously. I just had a case recently where there was a jury on one matter and a bench trial on the other, on the equity matter. But that's probably – it doesn't speak to the heart of equity to say that, but that's probably the major distinction as it procedurally occurs. And the difference between law and equity is a law case is what you're used to, right? Money damages, personal injury, contract dispute, things like that. It's something that can be solved generally with a money judgment. Equity is typically something that cannot be solved with a money judgment. And there's differences, but those are the two different types of cases. Lots of exceptions, but that kind of generally describes the difference. Yeah, the difference where you say, Judge, I want you to order this person to do something or not to do something. I want you to keep them from doing something. Are there any history majors in here? Okay. Both lawyers. So our law comes from common law England. And the reason why we have equity and we have law, courts of law, common law, common law and courts of equity is that in common law England, there were judges who heard the common law cases, and equity was – equity issues were sent to the church. So the church decided issues of equity, which makes sense because the priest would say, okay, you must do this or you can't do this, you need to stop doing this. So that's – they evolved separately. And then eventually our constitution and our lawmakers said, we really think – and in Illinois there were equity courts and chancery courts and law courts up until I think our 1970 constitution. And the – and we – and the – in the constitution, the people who developed the constitution said, all right, this is not efficient, so we're going to have judges do both. So we're in the same – you're in the same courtroom, but you're doing things a little bit differently. Yes, sir. I was just wondering, as a justice of the state court, what kind of a challenge is it for you to be aware and to have a fundamental understanding of the vagaries of federal bankruptcy in a situation like this case? Assuming you were not a bankruptcy practitioner as an attorney. Well, we don't labor in isolation. Each of us have three lawyers that we work with full time, some of whom are here. And they – well, first of all, the lawyers in their briefing direct us and educate us to the areas of the law that are federal that we need to see. But then we do an awful lot of research as well to make sure that we understand situationally whatever we need to know related to the case. But no one is an expert in every area of the law, state or federal. So it's often the case where we have to do deep dives into areas we're not necessarily familiar with. I started as a trial judge in 2006, so the onslaught came right as I first took the bench. So I heard foreclosure cases not like a foreclosure judge would hear in DuPage County or in Cook County that just heard thousands and thousands. But it was more than half of my call, so it gave me some understanding. But smart enough to know what you don't know is the very important part of this. And it also plays into an earlier question about time. Sometimes we realize that the issue is a fine point that needs to be discovered. Also, we have the Supreme Court is wise enough to understand that we need training and help. We don't automatically know everything, so we go to class for a week. We have an intense week of class that the Supreme Court sends us to. And frequently, and we have courses throughout the year, and they bring in people who are familiar and who are experts in areas like bankruptcy. They will bring in bankruptcy judges, and they will educate us. Especially about, at the trial court, they will educate us when we shouldn't be taking any action. But more than that, we get a lot of extra training that is provided by the Illinois Supreme Court. And then everything we do, as you see today, is in panels of three. So oftentimes, one of the three of us does have exposure to whatever the issue is, and that can serve as a basis for discussion as well. So I really appreciate you guys explaining latches, because I know that looks like a lot of students were probably struggling with. I wondered if you could give us a real quick little primer on 1401 and 615, because I know those numbers were thrown around a lot tonight. Okay, so your question is, can we explain Section 2-1401 of the Code of Civil Procedure and Section 2-615 of the Code of Civil Procedure? Justice Howell. I knew it was coming. I thought that Adrian was going to answer that question. I'll go with 615. You guys can do 214-01. 615 is a basic motion that says you have not stated a cause of action. And if you are a trial judge at all in civil court and you're hearing cases, lawsuits, and again, to go back to my experience, because of the place I'm from, a smaller jurisdiction, I had to hear all kinds of cases. So 615, I remember talking to Judge Gomelinsky, who is an arbitrator right now, but he handled the call up in Cook County forever, thousands of cases, and he would never look at a brief in a 615 on a rare occasion. Because you can look at the complaint and say, does this state a cause of action? Well, what is a cause of action? What are the elements of latches? That's the first thing. And then, does this complaint state that? So that's a 615 motion. That's the Code of Civil Procedure. Very frustrating to me when I started as a trial lawyer. I came from a criminal background. It's like, why are they arguing about this? We know that they're going to be able to state a cause of action, and they keep coming back on this. I have to agree, but at some point I'm not going to agree, and we're going to go forward. There's also what's called the 619 motion, which says that's true. All right? I believe you. But you still don't have a cause of action for some other reason. Statute of limitations is wrong. Factually, I have an affidavit here that says that we paid that debt, or that something else happened. So those are procedural aspects to this. Now, 1401, which has, I believe, a tortured background, which I'll allow my colleagues to talk about. You're doing such a good job. It's reviving a case that should be gone because 30 days has run, but there's a window for a second chance. Justice Brennan? So a judgment is generally final. You have 30 days to file a motion to reconsider or an appeal. If that period of time passes, 21401 is a mechanism to correct a mistake. There was some problem with the judgment, and there's a whole host of criteria that you might be able to use to attack a judgment. And generally you have two years to do that. In this case, it was interesting, many more than two years went by, right? That's because there's an exception to the two-year rule, and it is if somebody has not been properly served and was then subjected to a judgment, there's no two-year limitation. It's essentially forever unless something like latches or some other defense intervenes. And generally 21401 motions have to raise issues that could not have been brought at the trial level, that there's something on the outside or some reason or some reason why it couldn't be brought up at the trial level, but it changes the outcome and is really, really significant. And so that's generally a requirement of a 21401 petition. Today's proceedings are being recorded on video. I don't see a court reporter doing it, you know, like a court reporter transcript, so is that typical? Is that how you operate? We do not. So our arguments are recorded orally and are available usually the same day or the next day after argument. They are not transcribed unless there's a reason for that, and I don't know what that would ultimately ever really be because it's not evidence. It's just argument and discussion. So if someone were to appeal later, what we say here wouldn't really be relevant and transcribed. I suppose it could be, but I'm not aware of it happening as a gentleman. I've had the appellate court tell me before they weren't interested in my arguments. Exactly. You mean the Supreme Court? No, back when I was a trial court. You will see court reporters at the trial court level, and you don't see them at every trial. You see them at typically felony trials or pretrial Fairness Act cases because the Supreme Court has implemented a recording system, but there are court reporters that man the recording system so that there is somebody checking to make sure that you're actually getting a recording because sometimes when I was a trial judge, I would be starting a hearing, and we'd get a phone call on the bench from the control room where the court reporters were, and they'd say, a judge, you got the mute button on. Can you take the mute? So for felony cases and for adoption cases and for cases where you for some certain other kinds of cases, we still have live court reporters in the courtroom, but increasingly you have recording systems employed in the courtroom, but that's where you see court reporters, and they're amazing. But at the appellate level, never. I was wondering whether or not we were being recorded because typically we are not. So we're recorded but not video recorded, and here I believe the reason that we are on video, if Jack told me the truth, is that we have another room, an overflow room where this is being broadcast to, but not live streamed, which the Supreme Court does do their arguments live streamed, correct? Correct. And just to touch on what Adriana talked about, it really depends on resources. You are blessed here in DuPage County with a great deal of resources. Justice Brennan can speak to the availability of a court reporter. In my courthouse, we just put in the electronic recording system that Justice Albrecht was talking about. I think she had it for quite a while in Kankakee. There's a real shortage of court reporters, if anybody's out there that has an interest in doing that. The state is actually offering scholarships for that because even though we're recording it, on the end, somebody's got to transcribe it, and all of us that are lawyers are used to reading those transcripts, and that's how we work. I oftentimes, out of fear of the court reporters asking me for a transcript without them getting paid for it, because I was asking, would just use the electronic recordings that they all kind of use at the bench and that we eventually had. You know, things like when I would try a medical malpractice case, the experts would use words that nobody understood and nobody knew how to spell. So the court reporters would sometimes stop them and say, how do you spell that? Any additional questions? Yes? What are the circumstances and limitations of the court granting a motion to change venue? What are the circumstances under which a court might grant a motion to change venue? Well, there's a couple of different venue circumstances. One is that none of the parties actually are in the county. Sometimes what happened didn't happen in the county, and there isn't enough of a connection to the county. Sometimes the witness, the bulk of the witnesses are located in a different county, and it's a big hardship for the people who are going to be involved in the case to have the case happen in the place where it is filed. Or sometimes there are rules about where cases should be filed, and sometimes they don't follow the rules. And then other times it's referred to substitution of a judge. So change of venue, you're moving from one judge to another. You have a right one time to a change of venue, a change of judge, substitution of judge actually is how it should be stated. And then you also can ask if you believe that there's a reason that that judge could not be fair, I guess in the simplest sense. But that has to be before the judge has made any substantive ruling. The automatic substitution has to be made before a substantive ruling, and then we can go on and talk about what a substantive ruling is. And some of the recent case law developments on whether or not other issues might apply. But interestingly, that only works in the trial court. Because if you come to the appellate court and you see some horrible justice that you saw before and don't want to see again, you have no right to substitute. So I'm not sure why, but- The other reason why motions for change of venue are granted or are considered is when you have, for example, a case that has a lot of notoriety. Where you're going to have a really, really hard time getting an impartial jury. When you have just this high profile murder case that everybody in the county knows about and that you don't have a big enough county for you to be able to impanel an impartial jury. Well, we thank all of you for your rapt attention. More attention than we get in our homes or in our courtrooms generally. And it has been an honor to present to you today. And great to have the lawyers. We appreciate their willingness to come here and argue in a slightly different forum than they're used to. And without any further ado, court is in recess.